UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON ALLEN BROWN, #408842,

                Plaintiff,

    v.

DANA BOTT, et al.,

                Defendants.

_____/

Case No. 2:21-cv-56

Hon. Paul L. Maloney
U.S. District Judge

## **REPORT AND RECOMMENDATION**

### I.    **Introduction**

This Report and Recommendation (R&R) addresses Defendants' motion for summary judgment based on Plaintiff's failure to exhaust his administrative remedies.  (ECF No. 45.)

Plaintiff — state prisoner Jason Allen Brown — filed suit pursuant to 42 U.S.C. § 1983 on March 24, 2021.  In his verified complaint, Brown alleged that while he was incarcerated at the Marquette Branch Prison (MBP) in Marquette, Michigan, Defendants[1] violated his rights under the First and Eighth Amendments and participated in a civil conspiracy to violate his rights after he made an oral and

---

[1]    Brown named the following as Defendants: (1) Corrections Program Coordinator (CPC) Dana Bott, (2) Corrections Officer (CO) Unknown Allen, (3) CO Unknown VanAcker, (4) Lieutenant (Lt.) Unknown Baldini, (5) Sergeant (Sgt.) Unknown Torongo (initially named as John Doe #1 in the complaint), (6) Warden Erica Huss, and (7) Unknown Party #2 (named as Unknown PREA Coordinator in the complaint).  (ECF No. 1, PageID.6-7.)

written Prison Rape Elimination Act (PREA) grievance against Defendant Bott for sexually harassing him. (ECF No. 1, PageID.7-12.)

More specifically, Brown alleges that Warden Huss and the PREA coordinator conspired to violate inmates' First Amendment rights by implementing a policy of issuing insolence misconduct tickets whenever an inmate threatens to file a PREA grievance, and then progressively sanctioning inmates for each new threat. Brown contends that CPC Bott and CO VanAcker issued retaliatory misconduct tickets in accordance with this policy, and that Lt. Baldini and Sgt. Torongo sanctioned him in accordance with this policy. Brown further alleges that CO Allen retaliated against him for his PREA grievance by moving Brown to a second-floor cell despite a pre-existing knee injury and later destroying Brown's cell and dirtying Brown's property. According to Brown, the second-floor cell was covered in feces from other inmates, and CO Allen would not allow staff to give Brown cleaning supplies, further violating Brown's Eighth Amendment rights.

Defendants now move for summary judgment, asserting that Brown did not properly exhaust his administrative remedies with respect to any of his claims.[2] (ECF No. 45.) Defendants argue that Brown did not properly pursue his claims through the grievance or misconduct hearing process. (ECF No. 46, PageID.238-239.) In response, Brown says that he "exerted great amounts of effort to ensure that he complied with the exhaustion requirements of the PLRA," but that prison

---

[2] All Defendants other than Unknown Party #2 join in the motion for summary judgment.

administration interfered with his ability to exhaust his claims. (ECF No. 47, PageID.327-328.)

The undersigned respectfully recommends that the Court grant in part and deny in part Defendants' exhaustion-based motion for summary judgment. There is no evidence that Brown attempted to exhaust an Eighth Amendment claim against CO Allen based on the conditions of his second-floor cell. The undersigned therefore recommends that the Court grant Defendants' motion as to that claim. But there is ample evidence that Brown attempted to exhaust his retaliation claims. And in the undersigned's opinion, Defendants have not met their burden of establishing that Brown failed to properly exhaust an *available* administrative remedy. Furthermore, Defendants do not address the exhaustion of Brown's conspiracy claim. The undersigned therefore recommends that the Court deny Defendants' motion as to Brown's retaliation and conspiracy claims.

Additionally, the undersigned recommends that unless Brown can establish good cause for his failure to identify Unknown Party #2, the Court dismiss Unknown Party # 2 from this case in accordance with Federal Rule of Civil Procedure 4(m).

If the Court accepts this recommendation, the following claims will remain: (1) Brown's civil conspiracy claim against Defendant Huss, (2) Brown's First Amendment retaliation claims against Defendants Bott, Baldini, VanAcker, and Torongo based on their issuance or review of Brown's insolence misconduct tickets, and (3) Brown's First Amendment retaliation claims against CO Allen for moving Brown to a second-floor cell, and later destroying Brown's cell and dirtying his belongings.

## II.    Additional Relevant Procedural History

In a screening opinion issued May 6, 2021, this Court construed Brown's complaint as setting forth various claims of First Amendment retaliation, all based on the same protected conduct: Brown's PREA grievance against Defendant Bott for making Brown uncomfortable by staring at his "man-breasts."    (ECF No. 6, PageID.64.)  The Court determined that staring at Brown's chest did not rise to the level of sexual abuse or harassment, and therefore opined that the PREA grievance was frivolous.  (*Id.*, PageID.65-66.)   Because filing frivolous grievances does not constitute protected conduct, the Court dismissed Brown's complaint for failure to state a claim.  (*Id.*, PageID.66.)

On June 22, 2022, the Sixth Circuit Court of Appeals issued an order reversing this Court's screening opinion and remanding the case for further proceedings.  (ECF No. 23, PageID.168.)   There, the court determined that "one could reasonably interpret Bott's alleged conduct to satisfy the PREA's definition of voyeurism."  (*Id.*, PageID.166.)    And even if the Michigan Department of Corrections (MDOC) ultimately determined that the alleged conduct did not constitute voyeurism and that the grievance was therefore meritless, the court explained that not all meritless grievances are frivolous; "Frivolous claims are those that promote '[a]busive or manipulative use of a grievance system.'" (*Id.*, PageID.166 (alteration in original) (quoting *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir. 2012)).)  Additionally, the court found that Brown's complaint at least presented an Eighth Amendment claim based on Brown's relocation to a feces-filled cell, and a civil conspiracy claim against

4

Defendants Huss and Unknown Party #2 for interfering with Brown's right to file grievances. (*Id.*, PageID.167.)

### III.    Factual Allegations

Brown alleges that on May 13, 2019, he was removed from his work detail for disciplinary reasons.  Brown filed several grievances against his work supervisor, Librarian Bomer, relating to his removal.  On June 5, 2019, Defendant Bott called Brown to his office to review the grievances.  Brown questioned CPC Bott's role in reviewing the grievances and Bott became angry.  Brown says that he immediately left the office, and later filed a grievance on CPC Bott based on the interaction.

Approximately one week later, Bott came to Brown's cell to complete the grievance review.  Brown says that he was washing clothes at the time and was not wearing a shirt.  Brown says that he was uncomfortable with his body, especially his "man breasts."  Brown became increasingly uncomfortable when he noticed CPC Bott staring at his chest in a "voyeuristic manner."  Brown recalled that upon seeing heavy prisoners in the past, Bott had made comments such as "Look at the boobs on that guy."  And Brown says that Bott was aware that Brown had been sexually harassed/assaulted in the past and that Brown had a "submissive nature."

After becoming uncomfortable, Brown says that he attempted to cover himself and asked CPC Bott to stop staring at his chest.  When CPC Bott continued to stare, Brown informed Bott that he was going to file a PREA grievance against him if he did not stop.  But Bott continued, prompting Brown to yell for facility staff.  Brown continued stating "PREA, PREA, please get away from me."  At this point, Brown

says that CPC Bott responded by telling Brown that if he wanted to file PREA's against Bott, Bott would "write so many tickets" that Brown would be sure to stay in Level V.

After this encounter, Brown says that he asked housing staff for a PREA grievance form, but housing staff would not supply him with one.  Plaintiff then used a standard grievance form but labeled it as a PREA grievance.  True to his word, CPC Bott allegedly issued Brown an insolence misconduct ticket, which stated "Prisoner said he would write a PREA on me and I felt degraded."

During the misconduct hearing for the insolence misconduct ticket issued by CPC Bott, Brown "questioned his right to tell a staff member he would file a grievance if he felt he was being violated."  Brown pled not-guilty.  However, Brown says that the Hearing Officer for the misconduct ticket, Defendant Baldini, told Brown that the Warden and PREA coordinator had instructed all staff to write insolence tickets on prisoners who threatened staff with PREA grievances, hoping that it would decrease the PREA filings.  Lt. Baldini said that staff had been instructed to "progressively give 10, 20, and 30 days for each misconduct."  Baldini found Brown guilty of insolence and issued Brown seven days loss of privileges.

Brown says that he faced further retaliation on June 30, 2019.  According to Brown, Defendant Allen moved Brown to a cell on the second floor despite being aware of Brown's pre-existing knee injury and medical detail to bunk on the first floor.  CO Allen told Brown that the second floor was where he put prisoners who filed PREA grievances.  Brown was not given any assistance in moving his legal property

6

and had to carry it one handful at a time while holding onto the handrail with his other hand in order to keep the weight off of his injured knee. CO Allen allegedly laughed at Brown throughout this ordeal.

In addition to the cell violating his medical detail, Brown says that the inmate who previously occupied the second-floor cell had spent time throwing feces at his neighbor, who had responded by throwing feces back.  As a result, the walls, bars, and mattress all had fecal matter on them.  Brown says that he requested cleaning supplies, but CO Allen ordered housing staff to deny his request.  Brown filed a grievance regarding the move, which he labeled as a PREA grievance.  However, the grievance was construed as a regular grievance and rejected.  Brown avers that this was improper.

Two days after he was moved, Brown incurred an additional injury to his knee while in the yard.  Brown was issued crutches, ice, and an ace bandage, and was moved back to the first floor.  Brown's property was not moved with him, and he did not receive it until late the next evening.  When CO Allen returned to work the next day, he told Brown that as soon as Brown was off crutches, Brown would be moved back to second floor.  He further informed Brown that he would be "tearing up his cell on a daily basis."

On July 5, 2019, Allen shook Brown's cell down while Brown was in the shower. Allen threw Brown's eyeglass cleaning cloth and fingernail clippers in the toilet.  He also placed Brown's rusty footlocker on his bed, placed his sheets and blanket on the floor around the toilet, threw his toothbrush on the floor, knocked Brown's television

off its stand, and poured water on Brown's legal work and typewriter.  CO Allen later told Brown to "keep filing PREAs bitch." (ECF No. 1, PageID.10.)  Allen said that his partner, Defendant VanAcker, had told him about Brown's most recent grievance regarding the move to the second floor.  Brown says that he authored another grievance against CO Allen, labeled it as a PREA grievance, and placed it in the mailbox addressed to the PREA coordinator.  But once again, the grievance was construed as a regular grievance and rejected.

On July 6, 2019, Brown says that he asked Defendant VanAcker for a PREA grievance form. When questioned, Brown explained that CO Allen kept retaliating against him for the first PREA grievance Brown had filed on Defendant Bott.  Brown then told CO VanAcker that he was making a formal complaint to him about a PREA violation and expected VanAcker to report this to his supervisor pursuant to policy. CO VanAcker refused to give Brown a PREA form, stating that he thought Brown's complaint was appropriately raised in a regular grievance.

Later that day, Brown learned that CO VanAcker had issued him an insolence misconduct ticket for threatening to file a PREA grievance against CO Allen in order to degrade him.  Defendant Torongo reviewed the insolence misconduct with Brown and gave Brown seven days loss of privileges.  Defendant VanAcker later approached Brown and told Brown that he did not mean for Brown to lose privileges for seven days, but that he hoped that Brown would be dissuaded from filing future PREAs. Brown was told to pack up for a transfer the next day.

On July 8, 2019, Brown was transferred to the Bellamy Creek Correctional Facility (IBC). Brown says that he reached out to the MBP PREA coordinator and the MBP grievance coordinator multiple times, seeking information on his PREA grievances against Defendants Bott and Allen. However, officials at MBP claimed that they had not received any of the grievances. Brown says that he copied originals and sent duplicates, but they were also lost. Brown asked the IBC grievance coordinator and PREA coordinator for assistance and they advised him to file step II appeals on each grievance as both PREA grievances and as regular grievances. Brown states that also filed step III appeals on each grievance.

## IV.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury[3] or whether it is so one-sided that one

---

3      If defendants move for summary judgment on the basis of exhaustion under the PLRA, and the court determines that there is a genuine issue of material fact, the issue need not be submitted to a jury. *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015). Instead, the court may conduct a bench trial to resolve the issue. (*Id.*) In a bench trial on exhaustion, the defendants must show that the plaintiff failed to exhaust his administrative remedies by a preponderance of the evidence. *Id.* at 677 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)) ("Failure to exhaust administrative remedies is an affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence."); *Richards v. Perttu*, No. 2:20-CV-76, 2022 WL 842654, at *1 (W.D. Mich. Mar. 22, 2022) (affirming a magistrate judge's ruling that the preponderance of the evidence standard applies in a bench trial on exhaustion).

party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## V.    Exhaustion

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007). "[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions

under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). To properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016).

The Sixth Circuit reiterated the framework for an exhaustion analysis when plaintiffs allege that the actions of prison staff rendered their administrative remedies unavailable in *Lamb v. Kendrick*, 52 F.4th 286 (6th Cir. 2022). There, the Sixth Circuit explained:

> Even if an inmate has evidence to show that an administrative procedure was unavailable, he is not automatically absolved from the

> PLRA's exhaustion requirement because this Circuit requires inmates to make "affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable." *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (quoting *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir. 2011)). "When a prisoner makes affirmative efforts to comply but does not succeed, we analyze whether those efforts to exhaust were sufficient under the circumstances." *Id.* (quoting [*Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)]) (internal quotation marks omitted).

*Id.* at 292-93.   Because defendants bear the burden of pleading and proving a plaintiff's failure to exhaust, "if the plaintiff contends that he was prevented from exhausting his remedies," the defendant must "present evidence showing that the plaintiff's ability to exhaust was not hindered."  *Id.* at 295 (quoting *Surles v. Andison*, 678 F.3d 452, 457 n.10 (6th Cir. 2012)).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524.  In the Court's view, this objective was achieved in three ways.  First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Id.* at 525.  Second, "the internal review might 'filter out some frivolous claims.'" *Id.* (quoting *Booth*, 532 U.S. at 737*).  And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id*. When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration.  *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

Michigan Dept. of Corrections (MDOC) Policy Directive (PD) 03.02.130 (effective March 18, 2019) sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint.  Inmates must first attempt to informally resolve a grievable issue within two business days of becoming aware of the issue, unless prevented by circumstances beyond his or her control.  *Id.* at ¶ Q. If informal resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted informal resolution.  *Id.* at ¶¶ Q, W.  The inmate submits the grievance to a designated Grievance Coordinator, who assigns it to a respondent.  *Id.* at ¶ W.  The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely.  Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included."  *Id.* at ¶ S (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due.  MDOC Policy Directive 03.02.130 at ¶¶ U, DD.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances.  *Id.* at ¶ FF.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form.  *Id.*

at ¶¶ U, HH.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.  *Id.*  The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director.  *Id.* at ¶ II.

When the grievance procedures are not available because the issue presented is non-grievable, exhausting those procedures is not required.  It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well-known proverb states, they cannot have their cake and eat it too.").  However, when other administrative remedies are available, the prisoner is required to exhaust those remedies prior to filing a federal lawsuit.  Three such alternative remedies are potentially relevant to the claims in this case: the former PREA grievance process, the misconduct hearing process, and the warden's forum.

When an inmate claims to have suffered sexual abuse, MDOC policy directs the inmate to report the abuse in accordance with MDOC PD 03.03.140.  MDOC PD 03.02.130 at ¶ D.  During the timeframe of Brown's complaint, MDOC PD 03.03.140

at ¶ EE (effective Apr. 24, 2017, superseded Apr. 5, 2021) required prisoners to file and then appeal a PREA grievance in order to exhaust claims of sexual abuse.  It also appeared to require prisoners to file and then appeal a PREA grievance in order to exhaust claims of sexual harassment.  But in 2019, the Sixth Circuit Court of Appeals determined that the PREA grievance process was unnavigable and therefore unavailable to prisoners.  *Does 8-10 v. Snyder*, 945 F.3d 951, 956 (6th Cir. 2019) ("Clearly, the MDOC PREA grievance process is, in practice, filled with contradictions and machinations.").  Two years later, the MDOC eliminated the PREA grievance process altogether.  MDOC PD 03.03.140 at ¶ VV (effective Apr. 4, 2021) ("The MDOC has eliminated the administrative grievance procedure for addressing prisoner grievances regarding sexual abuse.").

When an inmate's claim is "directly related to the hearing process," MDOC policy directs prisoners to utilize the misconduct hearing process to exhaust the claim.  MDOC PD 03.02.130 at  ¶ J (9), (11).  This includes an inmate's claim that he received a retaliatory misconduct ticket, whether a Class I, Class II or Class III misconduct.[4]  *Siggers v. Campbell*, 652 F.3d 681, 693-94 (6th Cir. 2011).[5]  The inmate must first

---

[4]    Violations of written rules within the MDOC are classified as either Class I, Class II or Class III misconducts. Class I consists of the most severe violations, and Class III consists of the least severe.  While Class I misconducts are considered "major" misconducts and are "subject to all hearing requirements set forth in MCL 791.252", Class II and III misconducts are considered "minor" misconducts and are "subject to all requirements currently set forth in Department Administrative Rules and policy directives for 'minor' misconducts."  MDOC Policy Directive (PD) 03.03.105 ¶ B (eff. date 07/01/18).

[5]    In *Siggers*, the Sixth Circuit evaluated the exhaustion of a misconduct-related retaliation claim by looking to the misconduct appeal process.  652 F.3d at 693-94.  However, the undersigned acknowledges that in an unpublished opinion written the

raise the issue during the initial misconduct hearing.  *Id.*  If the inmate is claiming to have received a retaliatory Class I misconduct, he must then submit a Request for Rehearing raising the retaliation issue.  *Id.*; MDOC PD 03.03.105 ¶¶ SSS-TTT (setting forth the Class I misconduct appeal process).  Alternatively, if the inmate is claiming to have received a retaliatory Class II or III misconduct, he must file an appeal based on retaliation. *Rush v. Newcomb*, No. 2:18-cv23, 2019 WL 3755967, at *6 (W.D. Mich. May 24, 2019), *R. & R. adopted*, 2019 WL 3733846 (W.D. Mich. Aug. 8, 2019); MDOC PD 03.03.105 ¶¶ UUU-XXX (setting forth the Class II and III misconduct appeal process).

Finally, when an inmate's issue involves the content of a policy or procedure, as opposed to the individual application of the policy or procedure to the inmate, MDOC policy instructs the inmate to "direct comments to the Warden's Forum." MDOC PD 03.02.130 at  ¶ J (8).  The process for directing comments to the Warden's Forum is set forth in MDOC PD 04.01.105.

When prison officials waive enforcement of these procedural rules and instead consider a non-exhausted claim on its merits, a prisoner's failure to comply with those

---

same year, the Sixth Circuit stated that "[a]s distinct from the outcomes of misconduct hearings, the filing of retaliatory misconduct reports is grievable under MDOC Policy Directive 03.02.130." *Reynolds-Bey v. Harris*, 428 F. App'x 493 (6th Cir. 2011).  But it is published decisions that are binding within the Circuit, and *Reynolds-Bey* is not a published decision.  6 Cir. R. 32.1(b); *see also Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011) ("Unpublished opinions are, of course, not binding precedent on subsequent panels . . . but their reasoning may be 'instructive' or helpful." (citation omitted)).

rules will not bar that prisoner's subsequent federal lawsuit.  *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).  The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process.").  An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits.  *See id.* at 325.  We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court."  *Id.* at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[6]

## VI.    Exhaustion Analysis

To reiterate, Brown's complaint sets forth First Amendment retaliation claims against Defendants Bott, Baldini, Allen, VanAcker, and Torongo.  Brown's retaliation claims against Bott, Baldini, VanAcker, and Torongo are based on their issuance of a retaliatory misconduct ticket, or retaliatory sanctions for a misconduct ticket. Brown's complaint also sets forth an Eighth Amendment cruel and unusual

---

[6]    In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints."  *Id.* at 596. For example, grieving a doctor about his failure to give cardiac catheterization failed to grieve the claim that the doctor erred by not prescribing Ranexa.

punishment claim against Defendant Allen, and a civil conspiracy claim against Defendant Huss.  Defendants contend that Brown did not exhaust any of these claims.  Brown argues that he made sufficient affirmative efforts to exhaust them all. The undersigned first addresses Brown's retaliation claims against CO Allen.  The undersigned then addresses Brown's Eighth Amendment claim against CO Allen. Finally, the undersigned addresses Brown's misconduct-related conspiracy and retaliation claims against Defendants Huss, Bott, Baldini, VanAcker, and Torongo.

### a. First Amendment Retaliation (Allen)

Brown alleges that Defendant Allen retaliated against him for filing PREA grievances on multiple occasions.  First, on June 30, 2019, Brown says that CO Allen moved him to a cell on the second floor knowing that Brown had an ACL injury.  (ECF No. 1, PageID.9.)  Then, on July 3, 2019, after Brown sustained another injury and was moved back to a cell on the first floor, CO Allen told Brown that Allen would be "tearing his cell up on a daily basis" and that as soon as Brown was off crutches, Allen would move Brown back to the second floor.  (*Id.*, PageID.10.)  On July 5, 2019, Allen allegedly made good on that threat and shook down Brown's cell, throwing some of Brown's property into the toilet, placing Brown's sheets and blankets on the floor next to the toilet, knocking over Brown's television, and spilling water on Brown's legal property and typewriter.  (*Id.*)

Defendants say that Brown did not pursue his retaliation claims against CO Allen through all three steps of the grievance process.  (ECF No. 1, PageID.239.)  But

Brown says that he filed PREA grievances against Defendant Allen based on the incidents of retaliation.  (ECF No. 47, PageID.330.)

Brown's grievance <u>MBP-19-09-1326-27b</u>[7] read as follows:

This is a PREA grievance.

2nd shift officers gave me a duffle bag and told me that CO Allen was moving me but would not tell me where or why.  While packing CO Allen was doing a round and I asked him why I was being moved and he said because I filed a PREA and he doesn't allow PREA filers on base.

He then told me I was moving to 2nd gallery cell 7 because that is where the PREA people get to go.

This move was retaliatory and cannot be considered a housing unit necessity as there are several open rooms on base and multiple inmates on base with no job detail or base detail.

CO Allen is retaliating against me for filing a PREA against CPC Bott. His statement to me that 2nd gallery is where PREA people go clearly establishes his retaliation against me and I fear future retaliation from him as I have seen him retaliate against other inmates in the past.

Second shift has ignored 2 requests for a PREA grievance so I have used this.

(ECF No. 47-1, PageID.337.)  Brown's grievance <u>MBP-19-09-1325-27b</u>  read:

This is a PREA grievance.

This is my 2nd retaliation PREA grievance for CO Allen rooted from MBP190629446PREA filed on 6/19/19.

As grieved in the 1st retaliation grievance filed on 7/1/19, CO Allen moved me to G 2nd 7 as "that was where he put PREAs."  On 7/2/19, I

---

[7]    It is worth noting that while Brown alleges that he filed the grievance on July 1, 2019, and while he wrote "07/01/2019" in the "date" box on the grievance form, the grievance was stamped as being received by the MDOC on September 30, 2019.  The reason for this discrepancy is unclear.  Brown does not address the discrepancy in his response, and Defendants did not file a reply.

was injured while playing handball and was subsequently moved to G Base 12.

Upon Allen's return to work on 7/3, he told me I would[n't] stay here long that I would be going back to 2nd gallery with the rest of the PREAs.

During showers around 1915 hours on 7/5/19, Allen shook down my cell. He threw my eyeglass cleaning cloth in the toilet, put my rust/dirty legal footlocker on my bedding, threw my sheet on the floor and walked on it, leaving footprints, took a blanket from the floor and put it on my other sheet and blanket on the bed, threw my toothbrush on the floor, knocked my TV off the TV shelf and left it handing by the cable cord and spilled/knocked a cup of water from the writing surface on top of my typewriter.

At 1932, while making a round, Allen said "keep filing PREAs bitch." CO Allen continues to retaliate against me for filing the above referenced PREA on one of his co-workers as is evident by his comments and unruly behavior.  How does Allen know I filed a PREA grievance on him on 07/01/19 and why is he being allowed to continue to retaliate against me?

I continue to fear future retaliation from CO Allen.

(ECF No. 47-2, PageID.341.)

 Brown explains that when a prisoner filed a PREA grievance under the former PREA grievance policy, the prisoner was not required to attempt to resolve the issue with staff prior to filing their grievance.  (ECF No. 47, PageID.328 (citing MDOC PD 03.03.140 at ¶ GG).)  But Brown's PREA grievance against Allen was construed as a traditional grievance, and then rejected based on his failure to attempt resolution with Allen prior to filing the grievance.  (ECF No. 47-1, PageID.337.)

The undersigned again notes that the operation of the MDOC's former PREA grievance process was so confusing and contradictory that the Sixth Circuit Court of Appeals determined that it was unavailable to prisoners.  *Does 8-10*, 945 F.3d at 956.

And to be fair to Brown, the PREA policy did state that: "All prisoners and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations are protected from retaliation for reporting the incident or participating in the investigation."  MDOC PD 03.03.140 at ¶ V.  As such, it is not altogether unreasonable that Brown believed the proper administrative remedy for his retaliation claim was the PREA grievance process.

Furthermore, the rejections of Brown's Step I grievances simply read: "A review of your Step I grievance has been completed.  Your grievance is being rejected because you did not follow direction given in PD 03.02.130 *Prisoner Parolee Grievances*."  (ECF No. 47-1, PageID.337; ECF No. 47-2, PageID.341.)  The Step I rejections provided no explanation as to why Brown's grievances were being construed as traditional grievances despite the fact that he labeled them as PREA grievances.  And Brown says that he reached out to the facility's grievance coordinators on numerous occasions asking for clarity on the appropriate remedy to pursue, to no avail.  (*See* ECF No. 47-5, PageID.354, 360; ECF No. 47-6, PageID.362-364.)  Left without clarity on the appropriate administrative remedy, Brown appealed the rejection of his grievances through both steps of the PREA grievance process and all three steps of the traditional grievance process.  (*See* ECF No. 47-1, PageID.338-339; ECF No. 47-2, PageID.342-343.)

Defendants' argument in support of their motion for summary judgment is sparse.  Defendants conclude without explaining that the proper administrative remedy for Brown's retaliation claims against CO Allen was the traditional grievance

process set forth in MDOC PD 03.02.130.  (ECF No. 46, PageID.237-239.)  Defendants make no mention of Brown's attempts to exhaust his PREA-related retaliation claims through the PREA grievance process.  And after Brown raised the issue in his response, Defendant declined to reply.

In the undersigned's opinion, a reasonable juror could determine that Brown made sufficient affirmative efforts to exhaust his retaliation claims against CO Allen under the circumstances presented, but that the operation of the PREA and traditional grievance process were together so confusing as to render the remedies unavailable.  In other words, Defendants have not met their burden of establishing that Brown failed to properly exhaust an *available* administrative remedy with respect to his claims against CO Allen.  The undersigned therefore recommends that the Court deny Defendants' motion for summary judgment with respect to Brown's retaliation claims against CO Allen.

### b. Eighth Amendment (Allen)

In addition to alleging that Defendant Allen violated his First Amendment rights by moving him to the second-floor cell on June 30, 2019, Brown alleges that Allen subjected him to cruel and unusual punishment.  According to Brown, the cell was covered in feces, and Allen would not allow facility staff to provide Brown with supplies necessary to sanitize the cell.  (ECF No. 1, PageID.9.)  Defendants assert that Brown failed to exhaust this claim because he did not pursue the issue through Step III of the MDOC's grievance process.  (ECF No. 46, PageID.238.)

The only grievance that Brown provides the Court with respect to the June 30, 2019, incident is grievance <u>MBP-19-09-1326-27b</u>.  The undersigned notes that the Step I form for grievance <u>MBP-19-09-1326-27b</u> makes no mention of unsanitary conditions in the second-floor cell.  (ECF No. 47-1, PageID.337.)  Nor do the Step II or Step III appeals.  (*Id.*, PageID.338.)  Instead, the Step II appeal explains that Defendant Allen moved Brown to the second-floor cell knowing full well that Brown was assigned to the first floor while he awaited surgery for a knee injury.  (*Id.*)

Ultimately, Brown does not rebut Defendants' argument that he failed to exhaust his Eighth Amendment claim against Defendant Allen based on the condition of his second-floor cell.  In other words, there are no genuine issues of material fact bearing on the claim.  The undersigned therefore recommends that the Court grant Defendants' motion for summary judgment as to this claim.

### c.  Misconduct-Related Claims (Huss, Bott, Baldini, VanAcker, and Torongo)

The remainder of Brown's claims center around the alleged policy implemented by Defendant Huss and the PREA coordinator, which required facility staff to issue insolence misconduct tickets against prisoners who threatened to file PREA grievances, and then to issue progressive sanctions against the inmates.  Brown says that in early June of 2019, Defendant Bott issued him a retaliatory insolence misconduct ticket and Defendant Baldini found him guilty of the ticket and issued him sanctions in accordance with this policy.  (ECF No. 1, PageID.8.)  Brown further alleges that in early July of 2019, Defendant VanAcker issued him a retaliatory

insolence misconduct ticket and Defendant Torongo issued him sanctions in accordance with this policy.  (*Id.*, PageID.10.)

Despite the fact that Defendant Huss joins in Defendants' motion for summary judgment, Defendants do not address Brown's conspiracy claim against Defendant Huss at all.  Instead, Defendants seem to misconstrue the opinion of the Court of Appeals as identifying conspiracy claims against Defendants Bott, Baldini, VanAcker, and Torongo.[8]  (*See* ECF No. 46, PageID.237-238.)  But the opinion clearly referenced Brown's "conspiracy claim against MBP administrative officials for instructing staff to issue misconducts against inmates who threaten to file PREA grievances."  (ECF No. 23, PageID.167.)  And it later identified those administrative officials as Warden Huss and the PREA coordinator.  (*Id.*)  Because Defendants failed to address Brown's conspiracy claim against Defendant Huss, the undersigned recommends that the Court deny Defendants' motion for summary judgment as to that claim.

Turning then to Brown's retaliation claims against Defendants Bott, Baldini, VanAcker, and Torongo, Defendants argue that Brown did not properly exhaust the claims through the misconduct hearing process.  More specifically, Defendants assert

---

[8]    Defendants further appear to misconstrue the opinion as identifying a potential Eighth Amendment claim against Defendant Bott for sexual harassment. (*See* ECF No. 46, PageID.236.)  The Court of Appeals determined that the PREA grievance relating to Defendant Bott's alleged voyeuristic behavior was not frivolous, but it did not find that Brown intended to pursue an Eighth Amendment claim against Bott based on the alleged voyeuristic behavior.  (ECF No. 23, PageID.165-167.)  The only potential Eighth Amendment claim that the Court of Appeals identified in Brown's complaint was the Eighth Amendment claim against Defendant Allen for forcing Brown to live in a cell covered in feces.  (*Id.*, PageID.167.)

that Brown did not raise retaliation during his hearing on the misconduct ticket issued by Bott, and that he did not appeal the ticket. (ECF No. 46, PageID.239.) And Defendants say that Brown pled guilty to the misconduct ticket issued by VanAcker and waived his ability to file an appeal. (*Id.*)

In response, Brown attests that he did raise the issue of retaliation in his hearing on the misconduct ticket issued by Bott, and that he appealed the guilty finding. (ECF No. 47-9, PageID.378, 380.) And Brown attests that the only reason that he pled guilty to the misconduct ticket issued by VanAcker is that Torongo told him that if he was found guilty after a hearing, he would receive a higher sanction based on the policy implemented by Warden Huss and the PREA coordinator. (*Id.*, PageID.378.)

The undersigned once again notes that Defendants declined to reply to the issues raised by Brown. Defendants made no argument as to the legitimacy of the misconduct appeal provided by Brown, or as to Brown's allegation that he was coerced into pleading guilty to the second misconduct ticket. Furthermore, Defendants arguments do not take the nature of Brown's claims into account. Brown does not allege that Defendants issued him retaliatory misconduct tickets and sanctions purely of their own accord; Brown alleges that Defendants issued him retaliatory misconduct tickets and sanctions because Warden Huss and the PREA coordinator instituted a prison-wide policy requiring them to do so. In the undersigned's opinion, Defendants have not clearly established that the misconduct hearing process was the appropriate administrative remedy to exhaust these claims, especially where MDOC

policy directs inmates to the Warden's Forum for issues related to the content of a policy or procedure.  *See* MDOC PD 03.02.130 at ¶ J (8).

Ultimately, in the undersigned's opinion, Defendants have failed to meet their burden with respect to Brown's claims against Defendants Huss, Bott, Baldini, VanAcker, and Torongo.  Defendants did not address Brown's claim against Huss.  And they did not reply to Brown's assertion that he properly appealed the insolence misconduct ticket issued by Defendant Bott, or that he was coerced into pleading guilty to the insolence misconduct ticket issued by Defendant VanAcker.  Nor did Defendants sufficiently establish that the misconduct hearing process was the appropriate administrative remedy for Brown's retaliation claims under the circumstances presented.  The undersigned therefore recommends that the Court deny Defendants' motion with respect to these claims.

## VII.    Failure to Serve Unknown Party #2

As a final matter, the undersigned addresses the lack of service with respect to Defendant Unknown Party #2.  Federal Rule of Civil Procedure 4(m) sets forth the deadline for service of process.  It provides the following:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

Brown filed his complaint on March 24, 2021—nearly three years ago.  (ECF No. 1.)  Because this Court granted Brown leave to proceed *in forma pauperis*, this

Court was obligated to issue Brown's summons to USMS for service "once reasonable steps [were] taken to identify for the court the defendants named in the complaint." *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996); *see also* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process and perform all duties in such cases.").

It is not apparent that Brown has taken any reasonable steps to identify Unknown Party #2 since the inception of this case.  The undersigned therefore recommends that unless Brown can establish good cause for his failure to identify Unknown Party #2, the Court dismiss Brown's claim against Unknown Party #2 without prejudice.[9]

## VIII.  Recommendation

The undersigned respectfully recommends that the Court grant in part and deny in part Defendants' exhaustion-based motion for summary judgment (ECF No. 45).  There is no evidence that Brown attempted to exhaust an Eighth Amendment claim against CO Allen based on the conditions of his second-floor cell.  The undersigned therefore recommends that the Court grant Defendants' motion as to that claim.  But there is ample evidence that Brown attempted to exhaust his retaliation claims.  And in the undersigned's opinion, Defendants have not met their burden of establishing that Brown failed to properly exhaust an available administrative remedy.  Furthermore, Defendants do not address the exhaustion of

---

[9]    In the undersigned's opinion, this R. & R. provides Brown with sufficient notice that the Court may dismiss his claim against Unknown Party #2 under Rule 4(m).

Brown's conspiracy claim.  The undersigned therefore recommends that the Court deny Defendants' motion as to Brown's retaliation and conspiracy claims.

Additionally, the undersigned recommends that unless Brown can establish good cause for his failure to identify Unknown Party #2, the Court dismiss Unknown Party # 2 from this case in accordance with Federal Rule of Civil Procedure 4(m).

If the Court accepts this recommendation, the following claims will remain: (1) Brown's civil conspiracy claim against Defendant Huss, (2) Brown's First Amendment retaliation claims against Defendants Bott, Baldini, VanAcker, and Torongo based on their issuance or review of Brown's insolence misconduct tickets, and (3) Brown's First Amendment retaliation claims against CO Allen for moving Brown to a second-floor cell, and later destroying Brown's cell and dirtying his belongings.


Dated:  March 14, 2024             /s/ *Maarten Vermaat*
                                   MAARTEN VERMAAT
                                   U. S. MAGISTRATE JUDGE


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).